UNITED STATES of America, Plaintiff–Appellee,

v.

Lashawn Y. McDONALD, Defendant–Appellant.

No. 95–1338.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 25, 1995.

Decided Nov. 21, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 23, 1997.

Victoria Ursulskis (argued), Office of the United States Attorney, Indianapolis, IN, for Plaintiff–Appellee.

James H. Voyles (argued), Robert R. Thomas, Symmes, Voyles, Zann, Paul & Hogan, Indianapolis, IN, for Defendant–Appellant.

Before CUMMINGS, COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

In March 1994, Lashawn McDonald was indicted for possession with the intent to distribute approximately eleven kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). The defendant McDonald filed a motion to suppress; after a hearing, the district court found that the evidence seized was not in violation of McDonald's Fourth Amendment rights. Thereafter, the defendant pled guilty to the crime charged pursuant to a plea agreement in which she reserved the right to appeal the district court's denial of

her suppression motion, but waiving the right to appeal her conviction and/or sentence. See Fed. R.Crim. Pro. 11(a)(2). The court sentenced McDonald to 120 months' imprisonment to be followed by five years of supervised release and also imposed a special assessment fee of $50. The defendant appeals the trial court's denial of the motion to suppress. We affirm.

## I. BACKGROUND

On February 15, 1994, Detective Janet Cotton, Sergeant Jerry Ross and Detective Roy Potter of the Indianapolis Police Department were on a drug interdiction assignment at the Indianapolis bus depot.[1] On that date, Greyhound Bus No.1999 from St. Louis, Missouri arrived at the depot at 2:45 in the afternoon; on board was the defendant McDonald. The passengers of No.1999 temporarily disembarked during a short layover. Although the police officers did not have a search warrant they obtained permission from the bus driver to board and inspect the vehicle.

On board, the passengers' carry-on luggage was stored in overhead racks, above the seat rows. The officers proceeded to walk down the aisle, pushing and feeling the exterior of the bags in the overhead racks and sniffing the air surrounding the bags. Detective Cotton testified at the suppression hearing that she inspected two medium-sized softsided bags and felt objects in each and that she suspected that each contained a packed "brick" of a controlled substance.[2] After this observation she asked Sergeant Ross to inspect the bags. Sergeant Ross pushed and felt the exterior of the bags and agreed with Detective Cotton's conclusion and also suspected that both pieces of luggage in all probability contained narcotics. Neither Cotton nor Ross removed the luggage from the rack nor opened it, while Detective Cotton also observed that neither bag bore any identification. Shortly thereaf-

---

1. Concerned with the flow of illegal drugs, Greyhound Bus officials in Indianapolis, Indiana arranged for the Indianapolis Police Department to maintain a watch over suspected drug activity in and around the Indianapolis bus depot.

2. Detective Cotton, an officer with twenty-two years of narcotics experience, stated that the term "brick" refers to one kilogram of cocaine (or other narcotic) packed into a square shape resembling a building brick.

ter the officers departed the bus, leaving the bags in the overhead rack.

Outside the bus, Detective Cotton waited while the nine reboarding passengers got on the bus. On board, three female passengers sat in the front of the bus, while the other six passengers took seats at the rear. The three officers boarded the vehicle. None of the officers were in police uniform nor did any of them have a visible weapon; each was dressed in blue jeans. Potter and Ross proceeded to the rear while Detective Cotton positioned herself beside the three passengers at the front. After identifying herself as a police officer, Officer Cotton spoke with two female passengers sitting in close proximity to the suspect luggage and asked if either of them owned the identified bags on the overhead rack. Each of them individually denied ownership of the luggage. Detective Cotton next approached McDonald, who was sitting in front of the two female passengers with whom she had just spoken, again identified herself as a police officer, pointed to the two suspect luggage bags, and asked her if either of the two bags belonged to her. McDonald responded that they did not. Cotton then addressed all nine passengers on the bus collectively and asked if any of them claimed ownership of the bags. No passenger claimed ownership. Cotton then removed the bags from the luggage rack,[3] held them above her head, and again asked: "Do these bags belong to anyone on the bus?" Once more, there was no response. She repeated this inquiry two more times, each time receiving no response.

Cotton then moved the bags to the front steps of the bus. She told the driver they appeared to be abandoned. With the driver's permission, she opened the bags and inspected their contents; she found eleven kilogram bricks of cocaine (six in the black bag and five in the floral bag), women's clothing, and toiletries.

While Detective Cotton was opening the suspect bags, a passenger at the rear of the bus advised Detective Potter that he had observed McDonald carry the two suspect items of luggage on board the bus. Potter relayed this information to Cotton who observed that McDonald was the only female passenger on the bus who had the physical stature to be capable of wearing the clothes found within the bags. Detective Cotton approached the defendant McDonald, identified herself as a law enforcement officer and asked the defendant if she would mind stepping out of the bus to answer a few questions; McDonald agreed. Outside the vehicle, Cotton again asked the defendant McDonald if the luggage belonged to her. The defendant-appellant McDonald once again denied a connection with the bags. Officer Cotton then suggested the defendant accompany her to the police office located in the bus terminal, and McDonald agreed. Shortly thereafter, Cotton read McDonald her *Miranda* warnings and informed her that she wished to perform a pat-down search of her person for safety reasons. Thereafter, McDonald was placed under arrest.

A grand jury indicted McDonald for one count of knowingly possessing with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). McDonald filed a motion to suppress, asserting that the evidence of cocaine found in her luggage must be suppressed because the officers' examination of the bags' exterior (and subsequent removal and opening of the luggage) constituted an unlawful search in violation of the Fourth Amendment.[4]

After a hearing, the district court denied the defendant's motion, finding that the officers' touching and feeling of the exterior of the luggage did not constitute an unreasonable search and that McDonald had voluntarily abandoned the bags by repeatedly denying ownership of them. *See United States v. McDonald,* 855 F.Supp. 267, 269 (S.D.Ind. 1994). After the court denied the defendant's motion to suppress, the defendant agreed to enter a plea agreement to the crime charged, reserving the right to appeal

---

3. Up to this point, the police officers, including Cotton, had not moved the bags from where they were stowed on the bus.

4. For purposes of the motion to suppress only, the parties stipulated that McDonald owned the bags in question and thus had standing to file this motion.

the district court's ruling on the motion to suppress.

After hearing the defendant's testimony admitting the elements of the offense, the district court accepted McDonald's plea and found her guilty of the crime charged. The court sentenced the defendant to 120 months' imprisonment, to be followed by five years of supervised release, and imposed a special assessment fee of $50.

The defendant filed a timely notice of appeal, challenging the district court's denial of her motion to suppress.

## II. ANALYSIS

McDonald argues that the police officers' contact with the exterior of her luggage while it was on the overhead rack constituted a search within the meaning of the Fourth Amendment and that the search was invalid because it was conducted without a warrant, valid consent, or probable cause. The government maintains that the officers' mere touching and feeling of the outside of McDonald's luggage did not constitute a search for Fourth Amendment purposes. Second, McDonald argues that the officers violated her Fourth Amendment rights by opening her bags at the front of the bus even though she had repeatedly denied owning them. She contends that her abandonment of the bags was caused by the prior illegal search (*i.e.*, the feeling of her luggage) and by the confining atmosphere aboard the bus at the time the officers inquired of her concerning the ownership of the bags. The government argues that McDonald abandoned her bags when she disclaimed ownership of them after being asked, individually and as part of the group, five times by the officers whether the bags were hers. The government further maintains that McDonald's abandonment of her luggage was not rendered invalid by either the officers' feeling the bags or by the atmosphere on the bus.

### A. Police Officers' Contact With The Exterior Of Luggage

■ The district court denied McDonald's suppression motion, ruling that the police officer's examination of the exterior of the luggage exposed on the overhead rack did not violate the defendant's constitutional rights with regard to the facts underlying the district court's decision, we review this decision for clear error, "giv[ing] particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses." *United States v. James,* 40 F.3d 850, 874 (7th Cir.1994) (citations omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 948, 130 L.Ed.2d 891, *cert. denied,* —— U.S. ——, 115 S.Ct. 1160, 130 L.Ed.2d 1116, *cert. granted and judgment vacated on other grounds,* —— U.S. ——, 116 S.Ct. 664, 133 L.Ed.2d 515 (1995).

■ The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects shall not be violated, and no Warrants shall issue, but upon probable cause...." Thus, the Constitution protects against warrantless intrusions, but only where an individual has "a legitimate expectation of privacy." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). Government action amounts to a search when it infringes an expectation of privacy that society is prepared to accept as reasonable. *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *United States v. Myers,* 46 F.3d 668, 669 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 213, 133 L.Ed.2d 144 (1995).

■ The Supreme Court has "affirmed that a person possesses a privacy interest in the *contents* of personal luggage that is protected by the Fourth Amendment." *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983) (emphasis added) (citing *United States v. Chadwick,* 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977)).[5] However, "it is generally recognized that the privacy interest of people

---

**5.** We note that neither *Chadwick* nor *California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991), both cited by the dissent, involved a claim that the police had conducted a "search" *merely by touching the exterior of the* objects in question. *Chadwick* involved the search of the contents of a footlocker, while *Acevedo* involved the search of the contents of a bag that had been placed in the trunk of an automobile.

who are in transit [i.e. on a bus, train, or airplane] on 'public thoroughfares [is] substantially less than those that attach to a fixed dwelling.'" *United States v. Rem*, 984 F.2d 806 (7th Cir.1993), *cert. denied*, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993) (quoting *United States v. Whitehead*, 849 F.2d 849, 854 (4th Cir.), *cert. denied*, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988) (other citations omitted)).[6] Moreover, "[w]hat one knowingly *exposes* to the public ... is not a subject of Fourth Amendment protection." *California v. Greenwood*, 486 U.S. 35, 41, 108 S.Ct. 1625, 1629, 100 L.Ed.2d 30 (1988) (quoting *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)). The question before the court therefore is whether McDonald had a reasonable expectation of privacy that her luggage, left exposed on an overhead rack of a Greyhound bus, would not be touched or felt by others.

In a factual circumstance similar to McDonald's case, the Sixth Circuit has held that passengers have an expectation of privacy in the *contents* of their luggage, but that expectation does not extend to the *exterior* of luggage placed on overhead racks because such items are "accessible to others in the normal flow of traffic on the bus." *United States v. Guzman*, 75 F.3d 1090, 1095 (6th Cir.1996); *see also United States v. Gault*, 92 F.3d 990, 991–92 (10th Cir.) (holding that no search of the defendant's bag occurred when a DEA agent, who was "looking for evidence of drug trafficking" on an Amtrak train, "kicked and lifted" the defendant's bag to determine its weight, and determined from the kicking and lifting that the bag was heavy, which in his experience was consistent with the presence of drugs), *cert. denied*, —— U.S. ——, 117 S.Ct. 321, 136 L.Ed.2d 236 (1996); *United States v. Harvey*, 961 F.2d

1361, 1364 (8th Cir.) (holding that "[p]assengers have no objective, reasonable expectation that their baggage will never be moved once placed in an overhead compartment."), *cert. denied*, 506 U.S. 883, 113 S.Ct. 238, 121 L.Ed.2d 173 (1992); *United States v. Lovell*, 849 F.2d 910, 915 (5th Cir.1988) (holding that DEA agents' touching and squeezing of the defendant's luggage on an airport baggage carousel in order to facilitate a canine sniff did not constitute a search because the defendant *"had no reasonable expectation that his luggage would not be moved or handled. His reasonable expectation of privacy with respect to his luggage—that the contents would not be exposed to view—was not compromised by the agents' actions."*) (emphasis added); *United States v. Viera*, 644 F.2d 509, 510–11 (5th Cir.), *cert. denied*, 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169 (1981) (holding that external manipulation of luggage to facilitate a canine sniff does not constitute a search).

■ Given the unfortunate realities of today's world, where law enforcement authorities must combat a steady influx of illicit drugs, as well as guard against possible terrorist incidents accomplished with devices ranging from simple handguns to sophisticated bombs, it is not surprising that over the last few decades our society has accepted increased security measures (*e.g.*, hand-held metal detectors used to scan one's torso) at many locations such as airports, courthouses, hospitals, and even schools. In light of these realities, we agree with other courts of appeal that have held that the reasonable expectation of privacy inherent in the *contents* of luggage is not compromised by a police officer's physical touching of the exterior of luggage left exposed in the overhead rack of a bus.[7]

---

**6.** This diminished privacy interest derives from, among other factors, the myriad legitimate safety concerns that pertain to those who travel by common carrier. These concerns stem from either the risk inherent in the mode of travel itself, *see United States v. Whitehead*, 849 F.2d at 856, or from the danger of hijacking or bombing, *see National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 675 n. 3, 109 S.Ct. 1384, 1395 n. 3, 103 L.Ed.2d 685 (1989) (noting unanimity among lower courts that airport screening of all

passengers and carry-on baggage comports with Fourth Amendment).

**7.** Although the Supreme Court has not specifically ruled on the expectation of limited privacy inherent in the exterior of luggage on a public conveyance, the Court has ruled that exposing luggage for a canine sniff does not infringe upon an individual's Fourth Amendment rights:

A 'canine sniff' by a well-trained narcotics detection dog, however, *does not require opening*

■ In the present case, McDonald placed her bags in an overhead rack on a common carrier that was accessible to other passengers, and where other passengers also stowed their luggage. It is likely that in retrieving or stowing their own bags, other passengers on the public transportation vehicle would have to move, touch, or push McDonald's bags, and would in all probability feel the outside of her bags in doing so. McDonald can thus be said to have knowingly and voluntarily exposed the *exterior* of her bags to being physically touched by other persons. In other words, she did not have a reasonable expectation of privacy that the exterior of her luggage would not be felt, handled, or manipulated by others.

Further, the type of investigation employed by Officer Cotton was tailored to reveal only limited information without displaying the contents of the bags to anyone. Specifically, as with the canine sniff employed by the police in *Place*, the physical touching and feeling of McDonald's soft-sided luggage by an experienced detective, who over the years had acquired extensive knowledge of illicit drug trafficking, was not likely to reveal much information beyond raising to a high degree the officers' suspicion that the bags contained drugs, specifically "bricks" of contraband. The officers in the instant case did not open McDonald's bags, and in fact, prior to McDonald's disclaiming ownership of the bags, the officers did not move the

bags from the location where McDonald had placed them. Moreover, Detective Cotton, who at the time of the investigation had more than twenty-two years of police experience, testified at the suppression hearing that she was at the bus terminal for the express purpose of detecting illegal drug flow and had experience in detecting "bricks" by feeling the outside of bags. Thus, this type of . search "ensure[d] that [McDonald was] not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods." *Place*, 462 U.S. at 707, 103 S.Ct. at 2644.

We agree with the analyses provided by the Fifth and Sixth Circuits in cases analogous to the instant case before us. The Sixth Circuit in *Guzman*, 75 F.3d 1090, and the Fifth Circuit, in *Lovell*, 849 F.2d 910, and *Viera*, 644 F.2d 509, each concluded that police officers' manipulation of the outside of luggage did not invade the owners' reasonable privacy interests.[8] As in those cases, the feeling and pressing of McDonald's bags that the police officers undertook in the present case was nothing more than McDonald might expect from others, bus employees as well as passengers on the bus, moving luggage to adjust, remove, or make room for their baggage. The dissent argues that *Guzman*, *Lovell*, and *Viera* are distinguishable on the ground that they involved contact that was less obtrusive than that involved in the

---

*the luggage.* It does not expose noncontraband items that would otherwise remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited.
*Place*, 462 U.S. at 707, 103 S.Ct. at 2644. Thus, the Court held that exposure of the defendant's luggage, "which was located in public place, to a trained canine did not constitute a 'search' within the meaning of the Fourth Amendment." *Id.* Similar to a canine sniff, a police officer's touching and feeling of luggage does not require opening the baggage or inspecting its contents. Thus, the information gleaned from such action is limited. Also we note that the police, in order to facilitate a canine sniff, would in all likelihood

have to handle or manipulate baggage to make it accessible for the police dog. Because the Supreme Court has approved the canine sniff, it follows that the Court would also likely approve some degree of police handling and manipulation of personal luggage in order to make the luggage accessible to the police dog.

8. We are aware that in *United States v. Most*, 876 F.2d 191 (D.C.Cir.1989), the United States Court of Appeals for the District of Columbia Circuit held that a police officer's manipulation of the outside of the defendant's shopping bag, from which the officer concluded that the bag contained crack, was a search. That case is distinguishable, however, for in that case there the defendant had entrusted his bag to an individual shopkeeper before the officer undertook the search. In contrast, McDonald left her baggage on the overhead rack of a public bus, where she had a lesser expectation of privacy. *See Rem*, 984 F.2d at 812.

present case.[9] We disagree with the dissent's characterization of Detective Cotton's contact with McDonald's luggage as beyond the sort of occasional touching that a person expects hand luggage to endure in an overhead rack. Officer Cotton's touching of the luggage was no more intrusive than the now routine x-raying of all carry-on luggage at airports (and the increasingly routine x-raying of bags at public buildings), a technique that in a real sense allows one to "see" into the luggage without opening it. As the district court aptly observed, "[a]ny person who has travelled on a common carrier knows that luggage placed in an overhead compartment is always at the mercy of all people who want to rearrange or move previously placed luggage in order to squeeze additional luggage into the compartment or remove previously placed luggage." Memorandum Entry at 5 n. 5.

We hold that the officers' touching of the bags on the overhead rack did not constitute a search because McDonald did not have a legitimate expectation that her luggage left in such place would not be handled by others.[10] The district court therefore did not err in denying McDonald's motion to suppress the evidence.

### B. McDonald's Abandonment Of The Bags

The district court also found that McDonald *abandoned* the bags when she denied ownership both when Detective Cotton directly asked her whether she owned the suspect bags and collectively asked all the bus passengers if anyone owned the luggage in

question. McDonald specifically told Cotton that the bags were not hers. The district court determined McDonald's actions constituted an abandonment of the luggage, giving Detective Cotton the right to open the abandoned bags and inspect their contents. We examine this finding for clear error. *United States v. James,* 40 F.3d 850, 874 (7th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995), *cert. denied,* —— U.S. ——, 115 S.Ct. 1160, 130 L.Ed.2d 1116 (1995), *cert. granted and judgment vacated,* —— U.S. ——, 116 S.Ct. 664, 133 L.Ed.2d 515 (1995).

■ Abandoned property is not subject to Fourth Amendment protection. *Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960); *Bond v. United States,* 77 F.3d 1009, 1013 (7th Cir. 1996). We determine whether one has abandoned property by the "words spoken, acts done, and other objective facts [to determine whether she] voluntarily discarded, left behind, or otherwise *relinquished [her] interest in the property in question.*" *Bond,* 77 F.3d at 1013 (quoting *United States v. Ramos,* 12 F.3d 1019, 1022 (11th Cir.1994) (citations omitted) (emphasis in original)); *see also Rem,* 984 F.2d at 810.

On appeal, McDonald does not contest that the totality of the circumstances established that in fact she had abandoned the bags. Rather, McDonald argues that her abandonment was not valid because it resulted from an illegal search (i.e. the officers' initial touching of the bags), and from the "confin-

---

9. The dissent relies on *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), for the proposition that it is the degree of intrusion that determines whether an officer's conduct is lawful under the Constitution. To be precise, however, we note that the issue in *Dickerson,* which involved a patdown search following a *Terry* stop, was *not* whether the officer's touching of the exterior of an object was so obtrusive as to render it a "search" within the meaning of the Fourth Amendment. In *Dickerson,* there was no question that the officer's touching of the defendant's clothes constituted a search, albeit a patdown search for weapons. Instead, the question was: what could the officer do with the information that he gained from within the confines of a lawful patdown search? In contrast to *Dickerson,* the issue in the present

case is whether the officers' actions (their touching of the exterior of McDonald's luggage while it was in an overhead rack on a bus) constituted a "search" at all within the meaning of the Fourth Amendment.

10. The dissent asserts that neither the bus driver nor McDonald consented to the touching of McDonald's luggage. This is irrelevant in light of our holding that the officers' touching of the bags in the overhead rack did not amount to a search within the meaning of the Fourth Amendment. Moreover, we note that McDonald did have a chance to object to the opening of her luggage, but she chose to *abandon* the luggage as evidenced by her refusal to claim it.

ing atmosphere" created on the bus by the presence of three police officers.[11]

An abandonment that results from police misconduct is not valid. *United States v. Lewis,* 921 F.2d 1294, 1302 (D.C.Cir. 1990) (citing 1 Wayne R. LaFave, *Search and Seizure* § 2.6(b), at 471–74 (2d ed. 1987)). In examining the voluntariness of a person's response to a police officer's inquiry, a court should inquire as to whether a reasonable person (i.e. a person who was not carrying contraband) would feel free to refuse to comply with the officer's request. *See Florida v. Bostick,* 501 U.S. 429, 437–38, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991) (rejecting the defendant's argument that no reasonable person would freely consent to the search of luggage that he or she knew contained drugs because the " 'reasonable person' test presupposes an innocent person"); *Rem,* 984 F.2d at 812 ("It is irrelevant that [the defendant] may have made an unwise tactical decision ... based upon his fear that the police might have legal grounds for searching the suitcase or arresting him...."). Moreover, "[a]n abandonment that occurs in response to proper police activity has not been coerced in violation of the Fourth Amendment." *United States v. Miller,* 974 F.2d 953, 958 (8th Cir.1992).

McDonald argues that she was coerced into abandoning the bags because the police officers had unlawfully inspected the exterior of her luggage before asking whether the luggage was hers. However, we have held that the police action, physically touching the bags, was not a search because McDonald had no reasonable expectation that her luggage would not be handled by others. Furthermore, McDonald was unaware that the officers had conducted any type of investigation of the contents of the luggage for she was neither on the bus nor in near proximity to the bus when the officers touched the bags. From McDonald's perspective, nothing out of the ordinary occurred until after she returned to her seat on the bus. Shortly thereafter, a plain clothes officer (Detective Cotton) approached her

and asked her if the bags in question were hers. The record is barren of any evidence that McDonald knew that the officers had been on the bus during the layover or that anyone had touched her baggage. However, even if McDonald had seen the officers board the bus during the layover in Indianapolis, she had no reason to believe or even suspect that they were law enforcement officers for they were dressed in civilian clothes. Thus, the police inspection of the exterior of the luggage could not have caused McDonald to disclaim ownership of the bags and thus abandon them for, at the time the officers asked her if the bags were hers, she had no knowledge of the officers touching or feeling the bags. *See Miller,* 974 F.2d at 958.

In addition, there was nothing coercive about the manner in which McDonald was questioned. The law defining what constitutes a "seizure" within the meaning of the Fourth Amendment is instructive in this regard. Law enforcement authorities routinely approach citizens in public places and ask questions that may potentially elicit incriminating responses. Such encounters are permitted under the Fourth Amendment as long as they are consensual in nature. *See Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983) (plurality); *United States v. Thomas,* 87 F.3d 909, 911 (7th Cir.1996); *United States v. High,* 921 F.2d 112, 115 (7th Cir. 1990). In particular, law enforcement agents are entitled to board a bus and question passengers as long as those being questioned feel free to decline the officers' requests or otherwise terminate the encounter. *See Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991); *see, e.g., United States v. Graham,* 982 F.2d 273, 275 (8th Cir.1992); *cf. United States v. Kim,* 27 F.3d 947, 952 (3d Cir.1994) (holding that officer's questioning of defendant on train was consensual). When directly asked if she owned the bags, McDonald on two separate occasions denied ownership. Thereafter, neither McDonald nor the other passengers, when asked collectively four times, claimed

---

11. McDonald has failed to set forth in what manner the atmosphere was confining and therefore we assume that she believed it to be so because she was on a bus, which inevitably creates somewhat of a confining atmosphere.

ownership of the bags. Detective Cotton gave testimony during the suppression hearing, unrebutted at the time and unchallenged on appeal, that she did not raise her voice when she addressed McDonald directly, and raised it only so that all on the bus could hear when she addressed the passengers collectively. Cotton stated that she and the other two officers were not in police uniforms, but rather were attired in plain clothes, and that although each of them carried weapons, the firearms were concealed and not displayed during the course of the investigation. Detective Cotton stated that her two partners were in the back of the bus and not near McDonald, who was sitting near the front of the bus. Thus, there is no evidence that the officers talked to any of the passengers in anything but a normal conversational tone nor is there any evidence that any of the officers acted in a threatening manner. Under these circumstances, McDonald nevertheless denied ownership five times while on the bus and once after she had exited the vehicle with Detective Cotton. In contrast to McDonald's assertion, there is nothing in the record to demonstrate that the officers' actions in any way coerced the defendant into abandoning her luggage.

McDonald's situation is similar to that of the defendant in *Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389. In that case, the defendant on a bus allowed police officers to search his bag, which contained cocaine. The defendant argued that his consent was not voluntarily given because under the circumstances he felt compelled to allow the search. The defendant, in support of his argument, asserted that no reasonable person would allow police officers to search a bag he knew contained illegal drugs. The Supreme Court, however, declared that the proper inquiry was not whether a drug courier could reasonably be expected to refuse a police officer's request to search his bags, but whether an innocent person would feel free to refuse the request under the circumstances. *Id.* at 438, 111 S.Ct. at 2388.

■ The abandonment issue in the instant case is analogous to the consent issue in *Bostick*. The main reason McDonald denied owning the bags was that she was well aware that they contained drugs. This fact would obviously not enter into an innocent person's calculation of whether to affirm or deny ownership of her luggage. Absent the presence of the drugs or other contraband, it is hard to believe that a reasonable person would deny ownership of her luggage merely because the inquiry was made by a police officer aboard a bus.

We hold that the trial court did not clearly err in finding that McDonald had abandoned her luggage and thus the denial of her motion to suppress was not error.

AFFIRMED.

RIPPLE, Circuit Judge, dissenting.

This case presents a factual setting that takes place hundreds, if not thousands, of times each day across the country: A Greyhound bus pulled into the terminal for a brief layover; the passengers left the bus for a short rest stop and left their carry-on luggage on the bus. What happened after the passengers left the bus has not been as usual: Law enforcement officers boarded the bus and manipulated the luggage in the overhead rack to determine if it contained contraband. After today, this latter practice may become a frequently observed—and experienced—feature of travel on public transit. Because I believe that the Fourth Amendment protects people in the United States from such an intrusion into their private belongings, I respectfully dissent.

### 1.

At the outset, it is important to note what this case does not involve. The police did not have probable cause to believe that a controlled substance was on the bus. Indeed, they did not have reasonable suspicion to believe that such was the case.[1] It is also clear that the officers did not have the permission of the passengers to examine the

---

1. *See United States v. Place*, 462 U.S. 696, 700–06, 103 S.Ct. 2637, 2641–44, 77 L.Ed.2d 110 (1983) (holding that officers may stop a person in a public place when they have reasonable belief that the person is carrying contraband and may make reasonable inquiry into the circumstances that aroused the suspicion).

contents of their on-board luggage. The police officers obtained permission from the bus driver to board the bus and to inspect it without a search warrant. However, there is no indication in the record, nor do my colleagues suggest, that the bus driver validly consented to a police search of the possessions of passengers traveling on his bus.[2] There is no evidence that the passengers authorized him to make that decision or that the bus driver had common authority over the property.[3] Nor does the record reveal that any signs advised Ms. McDonald that her hand luggage was subject to inspection or search by law enforcement authorities.[4]

The officers in this case were not investigating a specific crime or pursuing a particular suspect. Rather, they were conducting a police sweep of the bus on which Ms. McDonald was traveling. This type of general sweep through the bus for narcotics is strictly controlled under the precedent of the Supreme Court.[5] Officers may board a bus to question passengers without their activity constituting a seizure as long as the encounter is consensual in nature. *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). The officers may ask to examine a passenger's identification and even his luggage as long as they do not require compliance, implicitly or explicitly, with their request. *Id.* at 437, 111 S.Ct. at 2387 ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."). In *Bostick,* "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* (citations omitted). In this case, no questions were asked of the passengers

2. *See Illinois v. Rodriguez,* 497 U.S. 177, 182–89, 110 S.Ct. 2793, 2798–2802, 111 L.Ed.2d 148 (1990) (consent from individual with apparent authority to consent to search is an exception to a warrantless search).

3. *See United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974) (noting that consent to search from third party who possessed common authority over property to be inspected may justify a warrantless search); *United States v. Most,* 876 F.2d 191, 199–200 (D.C.Cir.1989) (discussing *Matlock* and consent to search by third parties).

4. *See McGann v. Northeast Ill. Regional Commuter R.R. Corp.,* 8 F.3d 1174, 1182–83 (7th Cir. 1993).

5. The government quite properly does not attempt to justify the bus sweep operation by analogy to the warrantless search of luggage before boarding an aircraft or under the border search requirement. Those two exceptions have been defined precisely by the case law. In the case of airport searches, the passenger is given warning that the decision to utilize air transport implies a consent to search. *See McGann,* 8 F.3d at 1179 (noting that courts generally find "that persons presenting themselves at security checkpoints in order to board an airplane ..., knowing by way of a sign or other notice that doing so would subject the persons to search, have impliedly consented to the search performed"). Such a search must, of course, be narrowly tailored to the purpose for which it was legitimately undertaken. *See United States v. Doe,* 61 F.3d 107, 109–10 (1st Cir.1995) (positing that "[r]outine security searches at airport checkpoints pass constitutional muster because the compelling public interest in curbing air piracy generally outweighs their limited intrusiveness"); *United States v. De Los Santos Ferrer,* 999 F.2d 7, 9 (1st Cir.) (describing airport searches as administrative searches conducted for a "limited—and exigent—purpose"), *cert. denied,* 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993); *United States v. $124,570 U.S. Currency,* 873 F.2d 1240, 1243–47 (9th Cir.1989) (describing airport security searches as narrowly limited to their compelling administrative objective of searching for weapons and explosives); *cf. United States v. Soyland,* 3 F.3d 1312, 1316 (9th Cir.1993) (Kozinski, J., dissenting in part) (discussing administrative searches as "an oddity of Fourth Amendment jurisprudence" that demand proof of a compelling need for the intrusion and strict limitation of that intrusion to the fulfillment of that need), *cert. dismissed, Whitaker v. United States,* —— U.S. ——, 115 S.Ct. 32, 129 L.Ed.2d 928 (1994).

In the case of border searches, the Supreme Court has been similarly precise in the search of the inquiry. *See United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (approving border checkpoint stops for the purpose of limiting the flow of illegal aliens into the United States); *United States v. Johnson,* 991 F.2d 1287, 1293 (7th Cir.1993) (noting that, in a routine international border search, a person "could not have reasonably expected that her suitcase would pass through customs without being subjected to an X-ray examination"). The majority's equating of the situation at issue with the x-raying of luggage at an airport or upon

before the officers searched the luggage on the bus by feeling and sniffing the bags. Ms. McDonald did not have the opportunity to decline an officer's request for a search of her bags.

### 2.

Under these circumstances, the key issue is whether the actions of the officers invaded a legitimate expectation of privacy of Ms. Mc Donald. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) (confirming that the public has a legitimate expectation of privacy in letters and packages in transit through the mail or by private carrier). Officers who seek to search private property must respect the "legitimate expectation of privacy" in that property. *United States v. Rush*, 890 F.2d 45, 48 (7th Cir. 1989).

It is well established that a traveler has a legitimate expectation of privacy in his luggage, which is "intended as a repository of personal effects." *United States v. Chadwick*, 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977), *overruled in part, California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).[6] The Court reiterated this principle in *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983): "We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment." Our circuit has followed *Place* in recognizing this privacy interest.[7] "For just as the most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion, so may a traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attache case." *United States v. Ross*, 456 U.S. 798, 822, 102 S.Ct. 2157, 2171, 72 L.Ed.2d 572 (1982).

We therefore must determine the nature and extent of Ms. McDonald's legitimate expectation of privacy in her luggage when she left it in the rack above her seat during the bus stop in Indianapolis.[8] By placing her luggage in a public conveyance, Ms. McDonald certainly had an expectation of privacy less than in her home.[9] However, the degree of privacy that she sacrificed depends on the particular circumstances. Here, she did not submit the bags to a search as a condition of her carriage on the bus.[10] Nor did she check the luggage or otherwise place it in a situation in which she would lose control over it throughout the journey. While temporarily leaving the bus at an intermediate stop, she left the bags on the bus in the care of the driver of the vehicle.

Placing the luggage in the overhead rack certainly exposed it to certain intrusions. Exposure of the luggage in a public place gives the owner no legitimate expectation of privacy against the "sui generis" intrusion of a sniff by a trained canine. *Place*, 462 U.S. at 696, 103 S.Ct. at 2639. Ms. McDonald also assumes the risk that the bag might be subjected to the minimal sort of moving that

---

entry to public buildings therefore finds no support in established law.

**6.** The Supreme Court abrogated *Chadwick*'s formulation of the automobile exception to the Fourth Amendment in *California v. Acevedo*, 500 U.S. 565, 573–79, 111 S.Ct. 1982, 1987–91, 114 L.Ed.2d 619 (1991). However, *Chadwick* is still authority for its articulation of one's expectation of privacy.

**7.** *See United States v. Rem*, 984 F.2d 806, 809 (7th Cir.), *cert. denied*, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); *United States v. Vasquez*, 909 F.2d 235, 238 (7th Cir.1990), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *cf. Bond v. United States*, 77 F.3d 1009, 1013 (7th Cir.) (citing *Rem* for that proposition), *cert. denied*, — U.S. —, 117 S.Ct. 270, 136 L.Ed.2d 194 (1996).

**8.** *See Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); *see also United States v. Ruth*, 65 F.3d 599, 604 (7th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 1548, 134 L.Ed.2d 651 (1996); *United States v. Myers*, 46 F.3d 668, 669 (7th Cir.), *cert. denied*, — U.S. —, 116 S.Ct. 213, 133 L.Ed.2d 144 (1995).

**9.** *See Rem*, 984 F.2d at 812.

**10.** *See Chadwick*, 433 U.S. at 13, 97 S.Ct. at 2484.

occurs when other passengers seek to place other articles on the same rack. On this basis, our colleagues in other circuits have held that pressing lightly on a bag to facilitate a canine sniff of the air surrounding the bag does not constitute a search of the bag.[11] Similarly, the removal of the bag from the overhead rack to a level more commodious for a sniffing canine has been held not to interfere with the legitimate privacy expectations of the owner.[12] Therefore, the mere touch of a bag in an overhead rack by an officer has been held not to constitute a search.[13]

In each of the foregoing situations, the officer's contact with the bag might be described as the sort of unobtrusive touching that a person expects his property to endure if it is placed on the overhead rack of a bus. We must remember, however, that intrusions into the privacy of another are a matter of degree. Justice White emphasized the need for courts to be sensitive to this question of degree when he wrote for the Court in *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). In that case, police officers, acting with reasonable suspicion, subjected an individual to a patdown search for weapons. The search revealed no weapons, but the officer felt a lump in the man's jacket pocket and proceeded to examine it with his fingers. The officer then placed his hand in the man's jacket and removed the article, which turned out to be contraband. The Supreme Court held that the search had exceeded the scope of the legitimate patdown search for weapons and therefore constituted an impermissible intrusion. Drawing an analogy to the "plain view" doctrine,[14] the Court held that, if an officer is engaged in a lawful procedure of touching a suspect for a lawful reason (*e.g.*, the discovery of a weapon), he may seize an illegal substance if the nature of that substance is immediately apparent. Because the officer never believed the object to be a weapon and could not ascertain the nature of the object by limiting himself to the lawful patdown, the remainder of his intrusion into the clothing was constitutionally invalid. *Id.* at 379, 113 S.Ct. at 2139.

In the case before us, as in *Dickerson*, it is the degree of intrusion that makes the difference—a constitutional difference—in the lawfulness of the officers' conduct.[15] In *Dickerson*, the intrusion was lawful as long as it was calculated to discover the weapon that the officer had the right to detect and secure. When the officer penetrated further and conducted an exploratory examination of small items in the defendant's pockets, his search became unreasonable and the Fourth Amendment was violated. Here, the case law holds that an officer does not intrude on a legitimate expectation of privacy when he examines the air space surrounding a piece of luggage in the overhead compartment of a bus or when he subjects the luggage to the degree of movement that one would expect to encounter in the normal course of travel. If the degree of penetration is greater than what might be normally encountered, the officers' actions are unreasonable and run afoul of the Amendment's protection.

As my colleagues note, on factual issues, we owe great deference to the determination of the trial judge. Here, the trial judge described the officer's actions as "manipulating the sides of the bag with her fingers," *United States v. McDonald*, 855 F.Supp. 267, 268 (S.D.Ind.1994), and as "rubbing, squeezing, manipulating," *id.* at 269, the bag. This

---

11. See *United States v. Lovell*, 849 F.2d 910, 915 (5th Cir.1988); *United States v. Viera*, 644 F.2d 509, 510–11 (5th Cir.), *cert. denied*, 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169 (1981).

12. *United States v. Harvey*, 961 F.2d 1361 (8th Cir.), *cert. denied*, 506 U.S. 883, 113 S.Ct. 238, 121 L.Ed.2d 173 (1992).

13. See *United States v. Guzman*, 75 F.3d 1090, 1093–95 (6th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 266, 136 L.Ed.2d 190 (1996); *cf. United States v. Gault*, 92 F.3d 990, 992 (10th Cir.),

*cert. denied*, —— U.S. ——, 117 S.Ct. 321, 136 L.Ed.2d 236 (1996).

14. See *Michigan v. Long*, 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983).

15. See also *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (holding that police, lawfully present to search, because of exigent circumstances, for the perpetrator of a crime, his victims, and weapons, could not seize property not in plain view that they only suspected had been stolen).

sort of examination of the bag is hardly the sort of occasional touching that a person expects hand luggage to endure in an overhead rack. As the trial court recognized, it was a tactile inspection by an expert examiner aimed at discovering the nature of the contents of the bag, and it involved probing sufficiently intrusive to permit the identification of the internal contents of the bag. Indeed, the intrusion penetrated sufficiently to allow the officer to approximate the number of items in the bag. The owner of the bag, however, has a legitimate expectation of privacy with respect to the contents of the bag. That expectation was violated by the officer's inspection of the bag in a manner clearly calculated by the degree of its intrusiveness to reveal the contents.

### 3.

Nor can this illegal search be justified on the rationale that Ms. McDonald abandoned the bag when she failed to identify it at the request of the officer.

A warrantless search of property that has been abandoned is not unreasonable under the Fourth Amendment. *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960). In this case the majority wisely does not posit that Ms. McDonald abandoned the luggage when she exited the bus temporarily, leaving it unattended in a public place. Instead, it treats the suitcases as abandoned because she declined to claim them when the police officer who had conducted the search analyzed above inquired as to the ownership of the bag. An abandonment must be voluntary; if it results from a Fourth Amendment violation, it is not deemed voluntary. *United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 799, 133 L.Ed.2d 747 (1996). The majority also appropriately concedes that an abandonment can be rendered involuntary by a preceding illegal procedure. However, because the majority is of the view that the officer did not violate Ms. McDonald's expectation of privacy in her bag, it does not consider this factor in determining whether the bag was abandoned.

When Ms. McDonald returned to the bus, she was confronted by three police officers who, having singled out her bag during her absence by a means then unknown to her, inquired of her, and indeed of all on the bus, as to the ownership of the bag. Although she did not know what had been done to her bag, it was clear that something, yet undisclosed, had occurred in her absence. Ms. McDonald acted well within her rights in refusing to admit ownership of a bag that obviously had been the object of a great deal of police attention during her absence from the bus. The staged ritual of inquiring as to ownership was simply the next step in the illegal police inquiry that began when the bag was rubbed, squeezed and manipulated to ascertain the precise nature of its contents.

### 4.

Today's decision is a milestone in the unfolding of the Fourth Amendment jurisprudence of this circuit. In methodology, it is a departure from the decision of the Supreme Court in *Dickerson*, and from the substantive Fourth Amendment principles of *Bostick* and *Place*. The comparative restraint shown by the other circuits in restricting non-consensual examination of luggage to that sort of contact that might reasonably be expected in the normal course of travel is jettisoned.

The practical consequences of this decision are no less substantial than the doctrinal ones. From now on, law enforcement officials in the Seventh Circuit, without probable cause or even reasonable suspicion, may walk throughout public buses and trains and randomly manipulate closed luggage to determine its contents.[16] The effectiveness of this

---

**16.** In the strongest possible terms, the majority suggests that the exigencies of modern law enforcement require that the Fourth Amendment, as we and our forebearers have known it, should be sacrificed. Until today no American court has tolerated the intrusion permitted here. No American court has allowed the police, acting without any suspicion, any permission, or any exigent circumstances, to intrude deliberately into the privacy of the interior of a person's luggage. It is not one of the "unfortunate realities of today's world" that Fourth Amendment rights have been suspended or abolished because of the exigency of the moment. Judges do not

investigative methodology certainly can be questioned. Any experienced drug courier now will quickly invest in a hard-shell bag. It is the rest of the traveling public who will bear the onus of today's holding. No federal judge traveling by bus or rail would expect, or permit, a fellow passenger to rub, squeeze or manipulate his or her hand baggage in a concerted attempt to determine the contents. We should protect for others the privacy that we would demand for ourselves.

have the authority to work such a radical transformation in basic American liberties simply because they believe that the balance struck by the Framers was inappropriate. Indeed, the judicial task, grounded in our constitutional independence, is to check such attempts, despite their superficial attractiveness to resolve the problems of the moment. What Justice Jackson had to say about the government's invocation of the War Power ought to be remembered when today we deal with cases involving the war on drugs. *See Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 146, 68 S.Ct. 421, 425, 92 L.Ed. 596 (1948) (Jackson, J., concurring) (noting the danger of invoking the War Powers "in haste and excitement when calm legislative consideration of constitutional limitation is difficult", ... "executed in a time of patriotic fervor that makes moderation unpopular," and "interpreted by the Judges under the influence of the same passions and pressures").